**GTE.NET LLC d/b/a Verizon Internet Solutions and Verizon Select Services, Inc., Plaintiffs,**

v.

**COX COMMUNICATIONS, INC., a Delaware Corporation, and Coxcom, Inc., a Delaware Corporation, Defendants.**

**No. 00–CV–2289–J(BEN).**

United States District Court, S.D. California.

Jan. 29, 2002.

David J Noonan, Post Kirby Noonan and Sweat, San Diego, CA, Henry Weissmann, Munger Tolles and Olson, Los Angeles, CA, John P Frantz, Arlington, VA, for plaintiffs.

Susan K. Jamison, Coblentz Patch Duffy & Bass, LLP, San Francisco, CA, Barbara S. Esbin, David E. Mills, Michael J. Stawasz, Dow Lohnes and Albertson, Washington, DC, for defendants.

ORDER GRANTING MOTION TO STAY AND DENYING MOTION TO DISMISS [Docket # 13–1 and 13–2]

JONES, District Judge.

ORDER DISMISSING MOTION FOR SUMMARY JUDGMENT [Docket # 16]

This matter comes before the Court on Defendants' CoxCom, Inc. ("CoxCom") and Cox Communications, Inc. ("CCI") motion to dismiss, or in the alternative to stay, this action on the grounds of primary jurisdiction.[1] For the reasons discussed below, this Court now GRANTS Defendants' motion.

## I. BACKGROUND AND PROCEDURE

Traditional residential Internet access requires two distinct communication connections: a connection between one's home and the Point of Presence ("POP") of an Internet Service Provider ("ISP"), and a connection between the POP and the Internet. Customers dial into the POP over a telephone line, generally a bank of modems, using the modern in the residential computer. Service can be purchased in this manner from ISP's such as America Online and Verizon Online. [Second Amended Complaint ("SAC") ¶ 10].

---

1. CCI withdrew its previously filed Motion To Dismiss for Lack of Personal Jurisdiction and joined CoxCom's motion on December 5, 2001.

Increasingly, consumers desire a faster connection speed than those available via this traditional method. One such option is to purchase a broadband pipeline from a telephone company, utilizing high-speed telephones lines known as Digital Subscriber Lines ("DSL"). The DSL connects to the POP, and then to the Internet. Another emerging option is to use a cable modem to connect to the POP, which connects to the Internet. [SAC ¶ 11]. Considerable debate has developed over the characterization of these services under the Communications Act, and the corresponding level of regulation which should follow. *See Bova v. Cox Communications, Inc.,* 2001 WL 1654708, *3 (W.D.Va.2001).

CoxCom owns and operates cable systems throughout the United States, including within California. [Memorandum of Points and Authorities in Support of Cox-Com, Inc.'s Motion to Dismiss, or, in the alternative, To Stay on Primary Jurisdiction Grounds ("Motion") at 1]. Specifically, CoxCom is considered a cable multiple system operator which provides both one-way video programming services over its cable networks, and more advanced two-way digital services in select locations. [Motion at 4]. CoxCom is a wholly-owned subsidiary of CCI. [Motion at n. 1].

Plaintiff Verizon Internet Solutions ("Verizon") is an ISP which offers its services as Verizon Online. Verizon is a wholly-owned subsidiary of Plaintiff Verizon Communications, Inc. [ SAC at 4].

CoxCom has now entered into an exclusive contract with At Home Corporation ("Excite@Home") to provide high-speed Internet access over a cable modern. [Motion at 1]. The resulting service, known as Cox@Home, provides an integrated Internet content and transmission service. *Id.* at 4. CoxCom, "provides local connectivity on a shared basis from each cable system headend to the subscriber's premises" as well as "customer billing, certain technical support activities and local content." *Id.* at n. 3. Excite@Home is responsible for, "the entire Internet Protocol (IP) network from the Cable Modem Termination System (CMTS) located in each cable headend, and from there over an engineered private network to interconnection points on the public Internet." *Id.*

Thus, Defendants assert that the traditional "two-step" Internet connection paradigm is inapplicable to the Cox@Home network, which Defendants describe as "an integrated Internet content and transmission service." [Motion at 4]. The Ninth Circuit has aptly described a similar "bundled" product offered in an exclusive contract between TCI (one of the nation's largest cable television operators) and Excite (the ISP involved in the contract with CoxCom),

[S]ubscribers [of @Home] cannot purchase cable broadband access separately from an unaffiliated ISP, and have no choice over terms of service such as content and bandwidth restrictions.

The @Home cable broadband infrastructure differs from that of most ISPs. A typical ISP connects with the Internet via leased telecommunications lines, which its consumers access through "dial-up" connections over ordinary telephone lines. @Home operates a proprietary national "backbone," a high-speed network parallel to the networks carrying most Internet traffic, which connects to those other Internet conduits at multiple network access points. This backbone serves regional data hubs which manage the network and deliver Excite's online content and services, including multimedia content that exploits broadband transmission speeds. Each hub connects to local "headend" facilities...each headend connects to cable nodes in neighborhoods...which in turn

connects via coaxial cable to the user's cable modem and computer.

*AT & T Corp. v. City of Portland,* 216 F.3d 871, 874 (9th Cir.2000).

Plaintiffs initiated this action on November 14, 2000 [2], contending the Cox@Home service violates the Federal Communications Act, 47 U.S.C. § 151 et seq. as amended by the Telecommunications Act of 1996 ("FCA" or "Act"). Specifically, Plaintiffs argue that the Ninth Circuit in *AT & T Corp. v. City of Portland,* characterized the provision of Internet service over a cable modem as a "telecommunications service," imposing "common carrier" duties on the cable operator. Plaintiffs argue that the obligations contained in the Act require a common carrier to supply the high-speed cable connection to all requesting ISP's on nondiscriminatory terms and conditions. *See* 47 U.S.C. §§ 201(a) and 202(a). The SAC alleges CoxCom is in violation of these provisions by maintaining an exclusive relationship with Excite@Home, and refusing to negotiate with Verizon as a potential ISP.

Defendants filed this Motion to Dismiss asserting that the Ninth Circuit's discussion in *Portland* characterizing cable Internet service as a "telecommunications service" under the Act was purely dicta; therefore the proper characterization and corresponding regulation should be left to the expertise of the Federal Communication Commission ("FCC").

## II. DISCUSSION

### A. Legal Standard

 The doctrine of primary jurisdiction aims to promote "proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pacific Railway,* 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The doctrine is applicable where, "a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* at 63–64, 77 S.Ct. 161 (citations omitted). Primary jurisdiction is appropriate where conduct is alleged which, "at least arguably protected or prohibited by a regulatory statute and agency resolution of an issue is likely to be a material aid to any judicial resolution." *Digital Communications Network, Inc. v. AT & T Wireless Services,* 63 F.Supp.2d 1194, 1197 (C.D.Ca.1999) *citing Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 300–302, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973).

Particularly important when examining the doctrine of primary jurisdiction is the protection of the integrity of a regulatory scheme,

> The doctrine of primary jurisdiction operates as follows: When there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved. The doctrine applies when protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.

---

**2.** The initial complaint named only CCI as a defendant and alleged conduct violating §§ 201(a), 251(a), 201(b) and 202(a) of the Communications Act. The First Amended Complaint, filed December 1, 2000, added CoxCom as a defendant. This Court granted Plaintiffs' unopposed motion to file the Second Amended Complaint on January 9, 2002, which asserts two causes of action against CoxCom and CCI in violation of §§ 201(a) and 202(a) of the Act.

*Cost Management Services, Inc. v. Washington Natural Gas Company*, 99 F.3d 937, 949 (9th Cir.1996) *citing United States v. General Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir.1987).

▮ The Ninth Circuit examines the following four factors when evaluating the invocation of primary jurisdiction: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration. *Id.*

### B. *The Act and the Role of the FCC*

The FCA places wire services into three categories with distinct regulatory implications: cable services, telecommunications services, and information services. *See Bova*, 2001 WL 1654708, at *1. Traditionally, the FCA requires carriers of "telecommunications services" to be treated as "common carriers" subject to the obligations of §§ 201(a) and 202(a). Pursuant to the Act, common carriers are charged with the duties of nondiscrimination and interconnection, which "mandate a network architecture that prioritizes consumer choice, demonstrated by vigorous competition among telecommunications carriers." *Portland*, 216 F.3d at 879. Treatment as a common carrier would therefore prohibit CoxCom from maintaining an exclusive relationship with Excite@Home and force it to negotiate with any ISP, like Verizon Online, willing to provide a connection to the Internet.

Under the FCA, the FCC is vested with the responsibility of, "proscribing just and reasonable charges, practice, classifications and regulations regarding [wire and radio] services, in the event those adopted by a carrier are found to be unreasonable or otherwise in violation of the FCA." *IPCO*

*Safety Corp. v. WorldCom, Inc.*, 944 F.Supp. 352, 356 (D.N.J.1996). Issues surrounding the "determination of the reasonableness or discriminatory nature of common carrier rules and charges is squarely at the heart of the FCC's mandate." *Digital Communications*, 63 F.Supp.2d at 1200 *citing American Telephone and Telegraph Co. v. IMR Capital Corp.*, 888 F.Supp. 221, 244 (D.Mass.1995).

### C. *The Ninth Circuit's Characterization of Cable Internet Service*

There has been widespread and frustrating disagreement over the proper classification of cable Internet service. *See Bova*, 2001 WL 1654708, at *3 (discussing the circuit split between the 4th, 9th, and 11th Circuits). In fact, the FCC has yet to issue a formal classification and corresponding regulations. *See National Cable & Telecommunications Association, Inc. v. Gulf Power Co.*, —— U.S. ——, 122 S.Ct. 782, 151 L.Ed.2d 794, 2002 WL 53893 (publication page numbers unavailable)(discussing the FCC's refusal to categorize Internet services.)

Notably, the FCC initiated a Notice of Inquiry ("NOI") on September 28, 2000 to examine the proper classification of these services. *See* NOI ¶¶ 15–24. Specifically, the NOI is currently examining the extent to which, if at all, the obligations imposed upon common carriers under §§ 201(a) and 202(a) should be enforced with regard to cable Internet services. *See* NOI at B (entitled "Issues Surrounding Open Access").

*AT & T v. City of Portland* involved the question of whether a local cable franchising authority may condition a transfer of a cable franchise upon the cable provider's grant of unrestricted access to its cable broadband transmission facilities for ISPs unaffiliated with its proprietary service. 216 F.3d at 873. Specifically, Portland

examined the extent to which the FCA preempted local authority.

As described above, the newly merged AT & T (a long-distance telephone company) and TCI (a nation-wide cable provider), were attempting to offer the @Home service to subscribers in Portland, Oregon without providing "non-discriminatory access to the...cable modem platform for providers of Internet and on-line services." *Id.* at 875. The merger between the two companies passed the review of both the Department of Justice on antitrust grounds, and the FCC. The FCA, however, allows local franchising authorities to condition franchising transfers of "cable services" upon certain conduct. The City of Portland refused to approve the transfer of franchises given AT & T and TCI's refusal to offer open access to other requesting ISPs. *Id* at 874–876.

Since the city was exercising its franchising authority over "cable services" to condition the transfer of franchises upon the provision of open access, the Ninth Circuit first examined the proper classification of the @Home service. The court noted that the FCC had declined the opportunity, both in its regulatory capacity and as *amicus curie*, to determine the appropriate definition. *Id.* at 876.

In rejecting the definition of @Home as a "cable service," the court noted the distinctions between a cable television signal and cable Internet service,

> Internet access is not one-way and general, but interactive and individual beyond the "subscriber interaction" contemplated by the statute. Accessing Web pages, navigating the Web's hypertext links, corresponding via e-mail, and participating in live chat groups involve two-way communication and information exchange unmatched by the act of electing to receive a one-way transmission of cable or pay-per-view television programming. And unlike transmission of

a cable television signal, communication with a Web site involves a series of connections involving two-way information exchange and storage, even when a user views seemingly static content. Thus, the communication concepts are distinct in both a practical and technical sense. Surfing cable channels is one thing; surfing the Internet over a cable broadband connection is quite another.

216 F.3d at 876–877.

Therefore, Portland was not able to regulate @Home directly through is franchising authority over "cable services." The Ninth Circuit then went on to examine the extent to which the City's authority was limited by the FCA under the proper classification of the service. *Id.* at 877.

With traditional Internet service, the dial-up access to the ISP's POP over telephone lines is considered a "telecommunications service," while the connection between the ISP and the Internet is considered an "information service." *Id.* As discussed above, the "telecommunications service" or dial-up portion is subject to common carrier or open access duties. *Id.* In contrast, the "information service" portion has never been subject to regulation under the FCA. *Id.* at 878.

While outside the traditional concept, the Ninth Circuit defined the @Home service as hybrid between a "telecommunications service" and an "information service,"

> Like other ISPs, @Home consists of two elements: a "pipeline" (cable broadband instead of telephone lines), and the Internet service transmitted through that pipeline. However, unlike other ISPs, @Home controls all of the transmission facilities between its subscribers and the Internet. To the extent @Home is a conventional ISP, its activities are that of an information service. However, to the extent that @Home provides its subscribers Internet transmission over its

cable broadband facility, it is providing a telecommunications service as defined in the Communications Act.

216 F.3d at 878.

The Court was therefore able to conclude that the FCA prohibits the City from conditioning the franchise transfer on open access when to the extent "telecommunication services" are involved.

Defendants take issue with the Ninth Circuit's classification, arguing that once the court concluded @Home was not a "cable service," there was no authority for the City of Portland to regulate the franchise transfer. The remaining discussion, Defendants argue, was merely *obiter dictum* with no binding precedential value.

This Court, however, believes the Ninth Circuit's discussion and resulting classification was, in fact, necessary to the *Portland* court's holding. By defining @Home as partly a "telecommunications service," the Ninth Circuit was able to articulate the FCA's prohibition of local conditions on "telecommunications services." At best, the Ninth Circuit's discussion can be considered an alternative holding, but clearly not dicta. *See Russell v. Commissioner of Internal Revenue,* 678 F.2d 782, n. 2 (9th Cir.1982).

D. *The Regulation of Cable Internet Service*

■ This Court is compelled to follow the Ninth Circuit's definition of @Home as precedent, despite the widespread disagreement and pending NOI before the FCC. *Zuniga v. United Can Co.,* 812 F.2d 443, 450 (9th Cir.1987). It is this precedent which in fact mandates a deferral to the primary jurisdiction of the FCC on the enforcement of the common carrier obligations of the statute.

The Ninth Circuit expressly left the question of whether to impose the common carrier provisions of the FCA on cable Internet providers to the FCC,

Thus far, the FCC has not subjected cable broadband to any regulation, including common carrier telecommunications regulation. We note that the FCC has broad authority to forbear from enforcing the telecommunications provisions if it determines that such action is unnecessary to prevent discrimination and protect consumers, and is consistent with the public interest. Congress has reposed the details of telecommunications policy in the FCC, and we will not impinge on its authority over these matters.

216 F.3d at 879–880.

The rationale behind the *Portland* court's deference is clear upon an examination of the Ninth Circuit's test for primary jurisdiction. The complaint is primarily concerned with the FCA and the FCC's policies regarding the regulation of cable Internet service. Particularly poignant is the final factor, which recognizes the need for deferral when dealing with an issue requiring, "expertise or uniformity in administration." The regulation of cable Internet involves complex issues with far-reaching consequences. The issue is clearly not being taken lightly by the experts at the FCC, and this Court defers to that concern and pending investigation.

Plaintiffs rely on the court's statement that, "this *principle* of telecommunications common carriage governs cable broadband as it does other means of Internet transmission such as telephone service and DSL, regardless of the facilities used." [Plaintiffs' Consolidated Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss at 6 citing *Portland,* 216 F.3d at 879 (emphasis added)]. Plaintiffs' reliance is slightly misplaced. The Ninth Circuit was articulating the "competitive principle embodied by the dual duties of nondiscrimination and interconnection." *Portland,* 216 F.3d at

879. After emphasizing the importance of maintaining this competitive principle as Internet technology progresses, the court acknowledged the FCC's authority to "forbear" from enforcing the common carrier obligations if the Commission finds it "unnecessary" to uphold the ideal. *Id.* at 879–880.

The Ninth Circuit's deference to the FCC is consistent with Supreme Court guidance and the view of our sister circuits. *See National Cable,* —— U.S. ——, 122 S.Ct. 782, 151 L.Ed.2d 794, 2002 WL 53893 (noting the pending NOI and the power of the FCC to characterize Internet services); *MediaOne Group, Inc. v. County of Henrico,* 257 F.3d 356, 365 (4th Cir.2001)(noting the pending NOI and leaving issues of characterization and regulation to the FCC).

### E. *A Dismissal versus a Stay of the Proceedings*

 Defendants urge the Court to dismiss, rather than stay, these proceedings. However, it is practice in the Ninth Circuit to retain jurisdiction when deferring certain issues to an administrative agency, rather than relinquishing the issues via a dismissal. *See United States v. Henri,* 828 F.2d 526, 528 (9th Cir.1987).

### F. *Plaintiffs' Pending Motion for Summary Judgment*

In its order filed February 5, 2001, this Court continued Plaintiffs' Motion for Summary Judgment pending resolution of the instant motions. Given that the proceedings are to be stayed pending resolution of the NOI, the Court finds it appropriate to DISMISS WITHOUT PREJUDICE Plaintiffs' Motion for Summary Judgment and GRANT LEAVE TO REFILE once the stay has been lifted.

## CONCLUSION

For the reasons discussed above, this Court DENIES Defendants' Motion to Dismiss and GRANTS Defendants' Motion to Stay these proceedings pending the resolution of the FCC's NOI proceeding.

IT IS FURTHER ORDERED, that Plaintiffs' Motion for Summary Judgment be DISMISSED WITHOUT PREJUDICE. Plaintiffs are GRANTED LEAVE TO REFILE a summary judgment motion once the stay on these proceedings has been lifted.

**IT IS SO ORDERED.**